## GALVESTON, H. & H. R. CO. v. SLOMAN et ux. (No. 8195.)*

(Court of Civil Appeals of Texas. Galveston. June 23, 1922. Rehearing Denied Oct. 5, 1922.)

**I. Railroads ⬤⟾346(5)—Burden of issue as to discovered peril on plaintiff.**

In an action for death at a crossing, involving the issue of discovered peril, the burden is on plaintiff to show that the peril of deceased was discovered by the operatives of the locomotive, and that after such discovery the operatives could, in the exercise of ordinary care, have prevented injury.

**2. Railroads ⬤⟾348(6)—Evidence on issue of discovered peril held insufficient.**

In an action for the death of an automobile driver at a crossing, held that the evidence on the issue of discovered peril, though sufficient to support a finding that the peril of deceased was discovered when he was 40 feet from the crossing, was insufficient to sustain a finding that the peril was discovered in time to have avoided the collision in the exercise of ordinary care.

**3. Railroads ⬤⟾320—Operatives entitled to presume automobile driver will not cross ahead of train.**

The operatives of the engine of a rapidly approaching train have the right to presume that the driver of an automobile, in approaching a track where his view is unobstructed, will not attempt to cross in front of the train, and in such case no duty rests upon them to anticipate danger until he turns to make the crossing, and not then unless he is traveling at a speed indicating to a person of ordinary care that he intends to cross ahead of the train.

**4. Railroads ⬤⟾338—Discovered peril doctrine stated.**

To render a railroad company liable for injuries to a traveler under the theory of discovered peril, it must appear that the engineer in charge of the engine inflicting the injury realized the injured person's danger, and that he could not or would not extricate himself from the dangerous situation, yet failed to take precaution to avoid the injury.

Graves, J., dissenting.

Appeal from District Court, Galveston County; J. C. Canty, Judge.

Action by Charles W. Sloman and wife against the Galveston, Houston & Henderson

---

Railroad Company. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

John L. Darrouzet, of Galveston, and Garrison, Pollard & Berry, and Baker, Botts, Parker & Garwood, all of Houston, for appellant.

James B. & Charles J. Stubbs, and F. Spencer Stubbs, all of Galveston, for appellees.

LANE, J. The opinion on a former appeal of this case is reported in 195 S. W. 322. A statement of the case as last tried is as follows:

"This is an appeal, properly perfected and presented here by the Galveston, Houston & Henderson Railroad Company from a judgment of the tenth district court of Galveston county, Tex., entered April 27, 1921, against it in favor of Charles W. Sloman and his wife, Sarah Jane Sloman, who were the parents of Wiley W. Sloman, deceased, jointly for $7,500, awarded them as damages for the loss of pecuniary benefits alleged to have been reasonably expected by them from their said son, who had been struck and killed on November 23, 1913, by one of appellant's locomotives, operated by its employees, at a public crossing of its railroad by the public road from Texas City to Galveston, at a point between La Margue and Texas City Junction. At the time of the accident said Wiley W. Sloman was driving an automobile along said public road, both the automobile and the locomotive moving in the same direction towards Galveston, and the two collided at the point stated; the automobile being wrecked and said Wiley W. Sloman killed.

"The public road along which the automobile was traveling ran parallel with the railroad to a point 60 feet opposite said crossing, where it turned almost at right angles across the railroad; but there was a dirt road which continued south toward Texas City, likewise practically parallel to the railroad from this point or corner, from which the other public road, which was a shell road, turned, as stated, to cross the railroad."

The pleadings upon both sides at the last trial contained many charges and counter-charges of negligence and contributory negligence; but the case was submitted by the court to a jury upon special issues, which embodied the question of discovered peril only, these issues, with the jury's answers thereto, being as follows:

"Special issue No. 1: Did the defendant's servants in charge of the engine that was in collision with the automobile discover the danger of Wiley W. Sloman and realize the peril of Wiley W. Sloman in time to have avoided such collision in the exercise of ordinary care by the use of the means at their command? Answer: Yes.

"Special issue No. 2: At what place was the automobile driven by the deceased, Wiley Sloman, when the fireman actually discovered and realized that the deceased, Wiley Sloman, would attempt to cross the track in front of the train? Let your answer state at what place from the crossing where the accident occurred. Answer: 40 feet.

"Special issue No. 3: How far was the engine from the crossing or place of the accident when the fireman actually discovered and realized that the deceased, Wiley Sloman, would attempt to cross the track in front of the train? Answer this issue by stating the distance in number of feet. Answer: 385 feet.

"Special issue No. 4: What damages, if any, have been sustained by plaintiffs, Charles W. Sloman and Sarah J. Sloman? In this connection you are instructed that no recovery can be had for mental grief or agony, and that you can only assess such damages as you may believe from the evidence will be equal to the present money value (if paid now all at one time) of such pecuniary aid as plaintiffs had a reasonable expectation of receiving from the deceased, Wiley J. Sloman, if he had lived. Answer: $7,500.00."

Immediately following issue No. 1, the court instructed the jury as follows:

"In connection with and explanatory of this issue, you are instructed that the burden of proof is upon the plaintiffs to show by preponderance of the evidence that the engineer or fireman actually discovered the peril of the deceased in time, by the exercise of ordinary care, with all the means at their command, consistent with the safety of the train or its passengers, to have prevented the accident.

"You are further instructed, that the fireman and engineer operating the train in question in law had the right to presume that a party approaching a railroad crossing where his view was unobstructed would not attempt to cross in close proximity to or in front of a moving train, and no duty would rest upon the engineer or fireman to give any warning of the approach of said train until it reasonably became apparent to them that the deceased, Wiley Sloman, would attempt to cross the track in front of said train."

We agree with the trial court that the issue of discovered peril became the only one applicable to the developed facts of the case.

The only issues presented for our decision are: First, did the operatives of the train discover the peril of the deceased, Wiley Sloman, in time to prevent the collision, which resulted in his death, by the use of the means then reasonably at their command? and second, if such discovery was made, did said operatives thereafter use ordinary care to put in use all the means then reasonably at their command to prevent the collision?

As already shown, the jury, in answer to special issues submitted, found that the fireman on the locomotive actually discovered and realized that the deceased, Wiley Sloman, would attempt to cross the railroad track in front of the approaching train at the time Sloman was 40 feet from the point of the collision; that at the same time the locomotive was 385 feet from said point, and that after the discovery by the fireman that

Sloman would probably attempt to cross the track in front of the locomotive, the operatives in charge thereof could have avoided the collision in the exercise of ordinary care to use and by the use of the means at their command.

Appellant challenges the findings of the jury in that—(1) There was no evidence showing that the operatives of the locomotive, after the discovery of the peril of the deceased, Wiley Sloman, if there was such discovery, could, with the means at their command, have prevented the collision; (2) in that there is no evidence to support the findings of the jury that at the time the peril of the deceased was discovered the locomotive was 385 feet from the point of collision, and that the automobile driven by the deceased was only 40 feet therefrom, and in that such finding is against the great weight and preponderance of the evidence.

Appellant contends that the undisputed evidence shows that the train was running at a rate of speed of not less than 40 miles an hour, and that the lowest speed placed upon the automobile by any witness was 10 miles an hour, and as it was thus shown that the train was traveling at least four times as fast as the automobile, it is apparent that the automobile would have passed the point of collision and been 50 feet beyond it before the train reached said point, and that in such circumstances the collision could not have occurred.

After a careful review of all the evidence the majority of this court have reached the conclusion that the contention of the appellant should be sustained. If, as contended by appellant, the evidence shows that after the automobile turned to make the crossing it was running at a rate of speed of not less than 10 miles an hour, and we think it does, then it is clearly demonstrated that the collision could not have occurred, had the findings of the jury that at the time the automobile was only 40-feet from the point of collision and the train was 385 feet therefrom been correct.

[1] Upon the issue of discovered peril the burden was upon the appellee to show: First, that the peril of the deceased was discovered by the operatives of the locomotive which collided with the automobile in which the deceased was riding; and, second, that after such discovery said operatives could, in the exercise of ordinary care, have prevented the collision. Has appellee met this burden?

The facts and evidence bearing upon the issue of discovered peril was substantially as follows: The public road along which the automobile occupied by the deceased was traveling is situated about 60 feet east from the railroad track of the appellant, and runs parallel therewith for a distance of several miles. At a point directly east of the cross-ing, where the collision in question occurred, one branch, the main branch thereof, which leads to the city of Galveston, turns west almost at right angles and crosses the railway track of appellant. Another branch, leading to Texas City, turns at the point last mentioned eastward at about an angle of 35 degrees. Both the train and the automobile were approaching the crossing where the collision occurred from the north. The approaching train could have been seen by any one at or near the crossing for a mile or more. As the automobile was traveling along the road parallel with the railroad, and before it made the turn to cross the railroad it was traveling, as shown by the various witnesses, from 20 to 50 miles an hour, some witnesses placing its speed as low as 18 to 25 miles per hour, and others as high as 50 miles. As the train approached the crossing it gave the usual whistle at the whistling post, 440 yards from said crossing. It is conceded, as well as being manifest from the undisputed facts, that the operatives of the locomotive had no reason to anticipate that the deceased was in peril until he had turned to the right at about 40 feet from the point of collision.

That portion of the testimony of the several witnesses relative to the issue of discovered peril is substantially as follows:

W. N. Ayers, for the plaintiff, testified that the train which struck Sloman was coming from the north, going south to Galveston, and that Sloman was traveling in an automobile going in the same direction as the train; that when the automobile made the turn to cross the railway track it was about 30 or 40 feet from the crossing where the collision occurred; that just as he turned, Verbeck, who was with the witness, remarked that there was danger of a collision; that he would judge that Sloman was running the automobile between 18 and 20 miles an hour, after he turned to the right to make the crossing he was within a few feet of the railway track, and that he then thought he saw Sloman apply his brakes; that he did not notice the train trying to stop until after the collision; that he heard the air brakes go on after the collision. The witness admitted on cross-examination that shortly after the collision he had signed a written statement, and that in that statement it appears that he stated that the engineer applied the air just after the auto brakes were applied, but he stated, while testifying, that he did not intend to make such statement. Testifying further, he said:

"I looked to see if he had checked up or slowed up, and he never slowed up until he turned toward the track. I never saw him slacken up until he turned, and he was then in a few feet of the track, and the gentleman talking to me called my attention to the fact, and said: 'Look out, there is going to be a col-

lision.' The automobile and train were getting right close together. I had not observed the automobile before it passed me. It is a fact that about the time the automobile passed me I heard the train whistle the four blasts. At that time (meaning the time when I heard the train whistle), the train was, I should judge, about 200 yards from me. I heard the train making four long blasts, and at that time Wiley Sloman was just passing me in the automobile, looking out and waving at me. * * * There wasn't anything to obstruct Sloman's view. * * * Just before Sloman turned to cross the railroad the train was close to him, but I could not say whether they were even or not. They were practically parallel with each other, just before he turned in. There are two roads there. There is a shell road that comes on to Galveston and a dirt road. The two roads part right opposite the crossing. If you come to Galveston you must turn nearly at right angles to the right. The other road leads out across the prairie to Texas City, and persons going this way would not go to the right, but go on straight, turning a little to their left. Wiley Sloman lived at Texas City."

On redirect examination he testified that after the auto had passed him Mr. Verbeck remarked that there was danger of a collision; that at the time this remark was made the train had passed them; that Verbeck made said remark just as Sloman was in the act of turning; that the train was running about 40 miles an hour.

L. H. Verbeck, who was with the witness Ayers at the time of the collision, testified that he saw the auto occupied by Sloman as it passed him and Ayers going towards the crossing; that at that time he was about 300 feet from the crossing; that as Sloman passed them he waved at Ayers, and that then the train passed, and he said to Ayers, "Look, the automobile is going to hit the train," and just then the crash came; that it was apparent to him that Sloman intended to cross ahead of the train; that it was evident that the driver of the auto intended to cross ahead of the train; that he could not say whether or not the train slackened its speed before the collision occurred; that when he saw that the auto was crossing the track the train was so close that the collision was over as quick as a flash; that the train stopped just after the collision; that the speed of the auto was about 25 miles an hour.

On cross-examination this witness testified that he made a statement with reference to the collision shortly after it occurred. He admitted that in that statement he had said that the auto passed him at a speed of 50 or 60 miles an hour, that at that time he judged it was going about that fast, and that he had also stated that the auto was racing the train, and that it was only about 80 feet ahead of the train when it passed him; that he did not know at what point the brakes of the auto were applied. He tes-

tified that the statement made by him was correct. Testifying further, he said:

"When the auto passed us I heard the train whistle and I looked around, and I suppose probably it was maybe 150 feet or such a matter behind the automobile—maybe a little further: I cannot say exactly. I was looking at the automobile, and when I heard the train whistle I looked around, and then I noticed the automobile had just passed us a second or two, I suppose, when the train whistled. The whistle of the train was the first thing that attracted my attention, because the wind was blowing straight up the road and blowing the sound back up the track. The train was making considerable noise. I heard the whistle, and then looked around and said to Mr. Ayers, I said: 'That automobile is going to try to head the train off.' I heard the whistle, and then I looked in the opposite direction and in passing in front of me—the train passing in front of me—the bell was not ringing, or, if it was, I did not hear it. I suppose the automobile was going 50 miles or more when it passed. I suppose there was an engineer and fireman on the locomotive. I could see the fireman. He was leaning out of the window. He was on my side and looking ahead. I cannot say positively whether the engineer did or did not slacken the speed of the engine until after the collision. I don't think he did."

John Anthony, for the plaintiff, testified:

"When I heard the usual rumbling noise made by a running train I looked around, * * * and as I did so I saw the approaching train fully 150 yards or a little more down the track from the crossing * * * and at the same time I saw the automobile about 40 feet from the main line railroad track that runs over the crossing. * * * It was apparent to me when I first noticed the automobile that it was in danger of being struck by the train, unless the automobile stopped or unless the train stopped. * * * I don't think the brakes were applied— I am pretty sure they were not—nor was any effort made, so far as I could tell, to stop or check the speed of the train after it was apparent that the automobile was in danger of being struck by the train. The locomotive engine was not shut off until after the collision. * * * I was riding in my horse-drawn buggy. When I first saw the automobile it was right at the crossing, just crossing on the crossing; it had already turned and was about 40 feet away from the main track of the crossing."

Henry A. Smith, for the plaintiff, testified that he was one of the occupants of the automobile which was in the collision; that he could not say just how fast the automobile was traveling for a mile before it reached the crossing, but he judged that its speed was about 18 or 20 miles an hour, but that upon coming to the turn for the crossing it slowed down sufficiently to make the turn safely.

R. C. Paul's depositions were offered in evidence by plaintiff. He testified that he was the fireman on the engine which collided with the automobile; that he saw the auto first about one mile north of the crossing

where the collision occurred; that at that time the train was running 40 or 50 miles an hour; that his station on the engine was on the left side, and that of the engineer was on the right side; that when he first saw the auto it was ahead of the train, and going in the same direction as the train was going. Continuing, he said:

"After I saw the automobile I did not pay any further attention to it until I saw it turn to the right to go across. Right before they came to the turn they were looking back at us, and I never paid any more attention to it. We have things like that to occur every day. When they did look back I looked and observed the occupants of the automobile looking back at us; that was on my side; I did not notice them wave their hand or anything of that kind; I just saw them looking back, and I never paid any more attention to them. It seemed when they turned the corner they hit us; it was a very short distance; the automobile hit the train. The automobile was coming down along parallel with us, and when they hit the crossing they 'piped' right into us and hit on the right side of the engine. There was only one spoke broke out of the pilot. The automobile was thrown to the left-hand side, almost in the cattle guard. Nothing at all was on the right-hand side. I did not expect or anticipate or realize that the automobile would try to cross ahead of us. The bell was ringing; I was ringing it myself. I began ringing the bell before we hit the whistling board, that is a habit I got. I rang the bell before we hit the whistling board, and kept it up until after we made the crossing. The whistle was blown."

"I first spoke to the engineer or gave him warning when they turned the corner, at the same time they hit. I didn't say the automobile top was up; I said I thought it was. I could not tell if the automobile slacked speed there; they were running parallel with us. I could not say whether we were ahead of them or behind them, because they turned the corner just as they hit us. They were ahead of us before we got to the crossing. I could not say how far ahead of us they were. Things happened so quick I never had time to realize anything. I should judge the automobile was 3 telegraph poles ahead of the train when the parties in the automobile looked back; I don't know who it was that looked back; but I could see them looking back. * * * At the time the parties in the automobile looked back our train was about 2 or 3 telegraph poles from the crossing. I don't know how far the telegraph poles are apart, but that is the way we usually judge our distances along the line. I could not tell you how far the automobile was from the crossing at that time; it was in front of the engine; it was ahead of us all the time. I said the locomotive was going somewhere between 40 and 50 miles an hour."

The depositions of S. G. Works, the engineer in charge of the engine in question, were introduced. In these depositions he testified, among other things not necessary to be here stated, as follows:

"I have been a locomotive engineer since January, 1896. This was a regular Sunday train that ran from Houston to Galveston.

Passing Lamarque and coming on down that is open prairie up there. The shell road that the automobile was on was to my left coming this way. Running along I observed an automobile some 400 or 500 feet, 4 or 5 telegraph poles, from the crossing; that was about a mile north of the crossing; I observed the automobile about a mile north of the crossing. I should judge the automobile was 3 or 4 or 5 telegraph poles ahead of me when I observed it; of course, I could not give an accurate distance. Somewhere about a mile north of the crossing I was looking down and saw an automobile going on down the shell road in the same direction we were going, and some 4 or 5 telegraph poles ahead of me. Coming on further down, I was looking down the track, and naturally was keeping a lookout down the track. It is my duty as engineer to keep my eye and observation on the track, watch the track. It is a very common occurrence to see automobiles running alongside of the train between here and Houston, and it is a very common occurrence for them to go backwards and forwards along parallel with the train.

"I could not judge the rate of speed at which this automobile was going, but it seemed to be going pretty fast. We were making the usual schedule, which I believe is from 40 to 45 miles an hour. I should judge, if this automobile that I saw was the one that struck us on the crossing, that they were going pretty near as fast as we were. * * *

"I did not see or observe that automobile as it turned right in; I did not notice it then. It was impossible to stop the train before the collision after warning was given me. At the time I saw this automobile ahead of me I did not expect it to try to go ahead or beat me across that crossing. * * * The collision and the notification that I got were almost at the same instant. I did not see the party as he attempted to cross, and I did not see him as he turned in. It was impossible to have stopped the train in time to have avoided the accident after I realized, either by sight or information that I got, that there would be a collision."

S. G. Works, the engineer in charge of the train, was called by appellant as a witness, and testified on direct examination as follows:

"My name is S. G. Works. I have testified before in this case. I am the same Mr. Works whose deposition was read here this morning; I heard a part of the deposition read.

"An engineer is on the right side of the cab. My fireman on the engine was Mr. R. C. Paul. Mr. Paul, I believe, is dead in Europe somewhere; he died during the war in Europe I was told. Just about the time the automobile struck the engine Mr. Paul gave some kind of an alarm; I don't remember the alarm he gave; it was a verbal alarm; 'Look out!' or something to that effect. After Mr. Paul gave this alarm, and before the crash, I did not have time to blow the whistle or do anything. The mind will act almost instantly when you get the warning, but that will take probably a second or two, or three, maybe.

"I was promoted to engineer in January, 1896, and I have been running between here and Houston since September. I think it was,

in 1908. There are a number of crossings on the Galveston, Houston & Henderson track between here and Houston; the road from here to Houston crosses the railroad several times, quite a number of times. It is a very common occurrence to see automobiles passing the crossings. What I find and have continuously found parties doing who are riding in automobiles in approaching crossings, if they consider they have not time enough to cross safely, they usually drive up close and stop their machine at distances from the track that vary a great deal; some will drive very closely, and others will stand back as far as 35 or 40 feet. By 'very closely' I would say 5 to 10 feet sometimes. As an engineer, in seeing a party approaching a crossing at a distance from it, if there is not intervening time for him to get across, I certainly expect him to stop."

On cross-examination this witness testified as follows:

"I was on the right-hand side of the engine, and that is the side the throttle is on, also the emergency brake, and I was looking forward out of the window. When you are looking down the track the field of vision is more extensive than merely the parallel lines of the track. * * * A man running an engine would naturally suppose that the automobile driver would use all precaution in trying to stop before he would run himself into danger. I don't believe an engineer is supposed to think or know that a man driving a car is unconscious of the danger that he is in; I would not figure it that way. If I see there is danger of a collision I use all precaution to stop, and those precautions would be to apply the brakes in emergency; that is an air brake. It would probably take two or three seconds for the emergency brake to act, but as soon as it acts it slackens the speed of the train. After the engine is shut off the cylinder cocks would be inoperative; there would be no steam come out of those. I have the whistle right there also, and the whistle would blow if I pulled the cord, even if the steam was shut off. The shutting off the steam would tend to reduce slightly the speed of the car in time. I have no schedule issued by the Westinghouse air brakes people showing the air-brakes test. After I applied the air brakes in emergency the train would not begin to slow down within a fraction of a second, but in a very few seconds; it would possibly require two seconds or more before the brakes would commence to act particularly. The sand is not applied to the track automatically; that is there what we call the hand sander or lever that we pull to open the sand valves from the sand box, or what is known as an air sander, which is operated by turning a globe valve; that is convenient to where I was standing in the car or engine. I would state that two seconds or three seconds after the application of the air brake in emergency the speed of the train would begin to slacken."

We find in the above statement of the testimony sufficient evidence to support a finding that the fireman on the engine discovered the peril of Wiley Sloman at the time Sloman was 40 feet from the point of collision, and that in the very short space of time intervening between such discovery and

244 S.W.—18

the collision, shown not to have exceeded six seconds, he attempted to warn the engineer of the dangerous position of the deceased. It is not enough, however, to show that the peril of the deceased was discovered, but as the burden is upon the plaintiffs they must also show that the operatives of the train could, by the use of the means at their command, have prevented the collision, before they can recover.

What was the situation in the present case? The auto was being driven at a high rate of speed along a public road running parallel with the railroad; the fireman saw the driver as he passed Ayers and Verbeck look out of the side of the auto next to the approaching train, and believed that he saw the train, and, so believing, had no idea that the driver would try to cross the railway ahead of and in close proximity to the train, until the automobile turned to the right at a rate of speed that caused him, the fireman, to attempt to warn the engineer of the danger to deceased in time to prevent the collision. The undisputed and indisputable evidence shows that it would take a second or two after he saw the auto turn to the right to make the crossing for the fireman to impart his discovery to the engineer, and then it would take a second or two for the engineer to grasp the throttle and cut off the steam, the motive power, and then a second or so to grasp the lever and apply the air brakes, and in the meantime, as these things occurred, the rapidly approaching train was upon the crossing where the collision occurred and the fatal injury to Sloman was inflicted. That the auto was only 40 feet from the point of collision when the fireman first discovered or realized the perilous situation is conceded. No witness places the speed of the auto at less than 10 miles an hour; indeed, we have been unable to find where any witness places such speed at less than 18 miles an hour. Conceding, however, that the auto was only 40 feet from the point of collision, moving at a rate of speed of 10 miles an hour, and conceding, as we must, that the train was running at a rate of speed of 40 miles an hour, it must be conceded that the train was only 160 feet from the point of collision when the fireman discovered the peril of the deceased, instead of 385 feet as found by the jury. As before pointed out, the findings of the jury as to the distance of the automobile and the train from the point of collision at the time the peril of the deceased was discovered cannot be harmonized. As before shown, the undisputed testimony of both the engineer and the fireman was to the effect that they used all the means at their command to prevent the collision after the discovery of the peril of the deceased. It is true that the witness Anthony testified that so far as he could tell no effort was made to stop or check the speed of the train after it was apparent

that the automobile was in danger, but this testimony was clearly without any probative force, as he was in no position to know what effort was put forth by the operatives of the engine to stop or check the train.

[2, 3] A close and critical examination of the testimony of all the witnesses relative to the issue of discovered peril leads us to the conclusion that there is no evidence to support the answer of the jury to special issue No. 1, which is, in effect, a finding that the engineer and fireman discovered Sloman's peril in time to have avoided the collision in the exercise of ordinary care by the use of the means at their command. The operatives of the engine had the right to presume that the driver of the automobile, in approaching the railway track where his view was unobstructed, would not attempt to cross said track in front of and in close proximity to the rapidly approaching train, and in such case no duty rested upon them to anticipate danger to the driver of the automobile, until he turned to make the crossing, and not then unless said driver was traveling at such speed as would indicate to a person of ordinary care and prudence that the driver intended to cross ahead of the train.

[4] It is well settled that to render a railroad company liable for injuries received by one on or about its track, under the theory of discovered peril, it must appear that the engineer in charge of the engine inflicting the injury realized the injured person's danger, and that he could not or would not extricate himself from the dangerous situation, yet failed to take precaution to avoid the injury. International Ry. Co. v. Logan (Tex. Civ. App.) 184 S. W. 301; Railway Co. v. Phillips (Tex. Civ. App.) 183 S. W. 806; Lapp v. Railway Co., 178 Ky. 647, 199 S. W. 798; Cornett v. Railway Co., 181 Ky. 132, 203 S. W. 1054; Guthrie v. Railway Co. (Mo. Sup.) 204 S. W. 185, at page 186.

Appellee seemingly contends that, in the short space intervening between the notice of the danger of the deceased was passed from the fireman to the engineer, the engineer should have sounded the whistle, sanded the track, cut off the steam, and applied the air brakes. In the case of M., K. & T. Ry. Co. v. Trochta (Tex. Civ. App.) 181 S. W. 761, the court held that where the engineer was obliged to choose instantly between attempting to stop the train or blow the whistle to warn the injured party who was approaching the railway track at a public crossing, choice of attempt to stop was not negligence.

Having reached the conclusions as above expressed, and in view of the fact that the evidence seems to have been fully developed, the judgment of the trial court is reversed, and judgment is here rendered for appellant.

Reversed and rendered.

GRAVES, J. (dissenting). The law of this case was declared by this court through a full bench on the former appeal (195 S. W. 321); that decision was upheld by the Supreme Court in its refusal of a writ of error, and was tracked by the court below in the trial from which the present appeal proceeds; unwillingness on the part of this member of this tribunal to now strike down that determination and set at naught both the solemn verdict of another jury and the deliberate and orderly action thereon of the trial court calls, under the statute, for this statement of the grounds of that dissent. In brief they are these: On a record of fact decidedly less potential for liability against the railroad company than is presented under a jury's findings in the present instance, this court before unanimously held the question of whether or not Sloman's peril was discovered by the operatives of the train in time to have avoided injuring him by the exercise of ordinary care in using the means at their command to be one for the jury; now, when a jury, pursuant to that opinion, has been allowed to find the facts leading to a solution of that inquiry, a majority of this court, on no better warrant, it seems to the dissentient member, than the casting into the discard of the evidence on which those findings rested and the adoption instead of testimony the jury refused to accept, have nullified the jury's verdict and determined the cause against liability themselves. Where lies authority for such action? The majority opinion recites:

"The only issues presented for our decision are: First, did the operatives of the train discover the peril of the deceased, Wiley Sloman, in time to prevent the collision, which resulted in his death, by the use of the means then reasonably at their command; and second, if such discovery was made, did said operatives thereafter use ordinary care to put in use all the means then reasonably at their command to prevent the collision?"

I respectfully suggest that those issues were for the jury to decide, not this court. It is next declared:

"(1). There was no evidence showing that the operatives of the locomotive, after the discovery of the peril of the deceased, Wiley Sloman, *if there was such discovery*, could, with the means at their command, have prevented the collision; (2) there is no evidence to support the findings of the jury that at the time the peril of the deceased was discovered the locomotive was 385 feet from the point of collision, and that the automobile driven by the deceased was only 40 feet therefrom, and such finding is against the great weight and preponderance of the evidence." (The underscoring is my own.)

In sincere respect, but with much emphasis, both these conclusions are here challenged; on the contrary, the assertion is ventured that there lies in the body of the evidence ample support for each of the jury's

findings, indeed, that it so strongly preponderates the other way as to leave this court without the power to set those findings aside. Of course, it is a question of law as to whether there is any evidence to support a jury's verdict, and the court may also interfere where the great weight and preponderance of it is so against the verdict as to make the result thereby reached clearly wrong, but how either of these conditions can be said to obtain here, in the state of this proof, I confess myself unable to see.

It is freely conceded that the issue on the facts was a close one, but no closer, indeed not so much so as before, when this court said there was still room for the exercise of a jury's province.

At the outset, I put behind me all question as to whether the operatives, with the means at hand could have prevented the collision, provided they discovered the peril when their engine was yet 385 feet away, because the undisputed evidence showed that in just about that same distance after the collision, when none of the controls were applied until almost the same instant it occurred, the train was brought to a full stop, and therefore, of course, they could have.

In the next place I affirm that the evidence was clearly sufficient to support findings: (1) That the operatives of the engine did discover the peril at a time when it was at least possible by the exercise of ordinary care in the use of the means at their command to have avoided the accident, and that they did nothing until it was too late; (2) that the circumstances as a whole were such as to justify a refusal to accept the versions of the occurrence by the unfortunate engineer and fireman, upon which, apparently, the majority so much rely in reaching their conclusion; (3) that it was at least possible, under a reasonable interpretation of the testimony adduced and the jury's verdict thereon, for the collision to have occurred as they in effect found it did, while it could not have happened at all, if the statements of the engineer and fireman are to be taken at face value.

A brief incursion into the evidence bearing consecutively upon these suggestions is invited:

The engineer, S. G. Works, swore:

"I don't remember that the fireman said anything to me previous to the accident; he did not call to me or yell to me previous to the accident, but did just as the accident occurred. I heard the crash almost the same instant that the fireman called to me—you might say the same instant. Then I applied the air and stopped the train. * * * My answer to that was, that the collision and the notification that I got was almost at the same instant. * * * I did not check speed for the crossing at all. * * * I think it was between 3 and 4 telegraph poles that the train was stopped; that we did stop—that is, air applied in emergency; that is my recollection; I would not say positively, but that is my recollection."

Mrs. Louise Smith testified:

"After the accident the train stopped almost in front of my door. I was about 1½ blocks from the place when the collision occurred. * * * The train stopped as soon as it could after it struck the automobile, and stopped just in front of my door, which is about 1½ blocks from the crossing."

It was otherwise shown that the telegraph poles were 110 feet apart, so the distance within which the train actually stopped after the accident was somewhere between 330 and 400 feet, a balance between which limits gives precisely the 385 feet the jury said the engine was distant on the other side when the discovery of Sloman's plight was made; on the other feature the engineer reiterates that he put no controls on until about the same instant with the collision. So the train could have been—because it actually was—brought to a full stop within 385 feet, and this takes no account of the other means at hand, such as warnings by bell, whistle, or the blowing off of steam.

It is but a postulate to say that there could have been no peril as long as the two conveyances were moving 60 feet apart along parallel lines in the same direction, nor until Sloman turned at the corner to start across the railroad track; at page 324, paragraph 5, 195 S. W., of this court's opinion on the former appeal, that was pointed out; the inquiry is accordingly so narrowed, What does the evidence indicate that the engineer and fireman then knew, discovered, or realized? Unmistakably they knew both that Sloman was at the turning point and such other circumstances as to reasonably indicate that he intended to cross the railroad track in front of the train; they admit it themselves, or at the very least such contributing facts as make that conclusion a justifiable if not a necessary inference. The words of their own mouths condemn them; the engineer testified:

"I occupied the position on the right-hand side in the cab of the engine, and I had a clear open view ahead of me. R. C. Paul was on the left-hand side; he was fireman on my engine. I saw an automobile ahead of us as we approached the crossing; it was probably 3 or 4 telegraph poles, a distance of 3 or 4 telegraph poles ahead of us when I noticed it. There are 50 telegraph poles to a mile, I believe, and that would make the poles 110 feet apart, and make the automobile between 400 and 500 feet ahead of us. I don't remember that the fireman said anything to me previous to the accident; he did not call to me or yell to me previous to the accident, but did just as the accident occurred. I heard the crash almost the same instant that the fireman called to me—you might say the same instant. Then I applied the air, and stopped the train. I was just about on schedule time—probably a minute late, if I remember correctly. That was a regular Sunday train. I ran on the roads at other times, and was familiar with that road and that crossing. That crossing was used considerably. * * *

"The fireman had a window in front of him, but I don't remember whether or not it was open. When the window was closed, he could see through the glass. The openings on my side of the locomotive were unobstructed. * * * That crossing is the same as where the accident happened. It is the only crossing that can be used there by automobiles, as I understand it. I don't remember any other auto than the one that I saw just at the time of the accident or just before the accident.

"Q. At a distance of 400 or 500 feet you have a clear vision in front there that extends even beyond the smokestack, does it not, to right and left? A. Do you mean directly on the track?

"Q. I mean aside from the track. A. That depends on how far from the side. I presume 400 or 500 feet in front of the engine at the distance of 50 feet from the center of the track, a person could see an object.

"I was on the right-hand side of the engine, and that is the side the throttle is on; also the emergency brake, and I was looking forward out of the window. When you are looking down the track the field of vision is more extensive than merely the parallel lines of the track."

R. C. Paul, the fireman, testified:

"I saw the automobile first, I should judge, about a mile before we got to the crossing; some place about a mile. I could not say for sure; it has been so long. I never paid much more attention to it. * * * I did not say anything to the engineer at that time. The automobile was on my side of the engine. I noticed the automobile again when they turned right around the corner afterward. It had been going all along a little bit ahead of us all the way. * * * After I saw the automobile I did not pay any further attention to it until I saw it turn to the right to go across. * * * I don't remember whether the automobile top was up or down, but I think it was up. I could not tell you how far the automobile was from the crossing at that time; it was in front of the engine; it was ahead of us all the time.

"I was on the left-hand side, and when I first observed the automobile it was ahead of us; whatever the distance was, it was ahead of us and going in the same direction. After I saw the automobile I did not pay any further attention to it until I saw it turn to the right to go across. Right before they come to the turn they was looking back at us, and I never paid any more attention to it. We have things like that to occur every day; when they look back at us we don't pay any more attention to them. When they did look back I looked and observed the occupants of the automobile looking back at us; that was on my side; I did not notice them wave their hand or anything of that kind; I just saw them looking back, and I never paid any more attention to them. * * *

"I first spoke to the engineer or gave him warning when they turned the corner, at the same time they hit. I didn't say the automobile top was up; I said I thought it was. I could not tell if the automobile slacked speed there; they were running parallel with us. I could not say whether we were ahead of them or behind them because they turned the corner just as they hit us. They were ahead of us before we got to the crossing. I could not say how far ahead of us they were. Things happened so quick I never had time to realize anything. *I should judge the automobile was 3 telegraph poles ahead of the train when the parties in the automobile looked back;* I don't know who it was that looked back, but I could see them looking back. I did not see anybody alongside of the track at the time; I did not see Mr. Ayers, and I do not know Mr. Verbeck nor Mr. McNary. I might have seen them and waved at them, but I don't remember—so far as people going to and from that church. I did not see those men in the automobile wave; I don't know Mr. Ayers; I did not see the men in the automobile wave at anybody; I never paid any more attention to them."

It is quite true that the engineer further said that he did not see the automobile turn the corner, but in view, among other circumstances, of his unobstructed view, his seeing it a mile up the track, the fact that he was looking down the track ahead of him at the time and when so doing, at the distance he said the automobile was ahead of him, he could see an object 50 feet on either side of the center of the track, the jury were not required to believe him. Neither were they compelled to accept the fireman's quoted statement that the occupants of the automobile looked back "right before they came to the turn," because this was negatived by the other disinterested eyewitnesses W. N. Ayers and the sole survivor of the accident, Henry A. Smith. These were the only excuses offered by these trainmen for their confessed failure to do anything until just about the same instant of the collision; the engineer that he did not see the automobile turning at the corner—although he had eyes with which to see, was looking, and from his position had a range of vision that extended further from the railroad than the automobile could possibly have been—and the fireman that he saw the occupants of the automobile look back just before they turned, and paid no further attention to them. If therefore the jury had the right, under all the evidence, to disregard these explanations, appellant stands without a defense in this court, unless the mathematical argument adopted by the majority affords one. As to that, comment is made hereinafter. At this point the circumstances attending the accident come also from disinterested onlookers, the witnesses Ayers, Anthony, Verbeck, Mrs. Louise Smith, and Henry A. Smith, whose statements not only tend to affirmatively support the jury's findings, but clash in a number of material features with those of the two trainmen referred to. Only excerpts bearing on the matters now under consideration are here quoted:

Anthony testified:

"I saw the collision between the train and the automobile that Wiley Sloman was driving at the time. I had crossed the crossing and

gone about 100 yards down the road when I heard the usual rumbling noise made by a running train. So I looked around to the back from the direction in which I was headed, and as I did so I saw the approaching train fully 150 yards, or a little more, down the track from the crossing coming in the direction towards Galveston, Tex., and at the same time I saw the automobile about 40 feet from the main line railroad track that runs over the crossing. The automobile was also headed towards Galveston, moving towards the crossing at the time I saw it, and just coming into the crossing at the turn of the road which leads over the railroad track. * * * When I first saw the train it was fully 150 yards, or a little more, down the track from the crossing, and the automobile at the time I first saw it was about 40 feet from the main line track that the train was on and that runs over the crossing.

"It was apparent to me when I first noticed the automobile that it was in danger of being struck by the train, unless the automobile stopped, or unless the train stopped. * * * I heard neither the engine whistle nor the ringing of its bell as it approached the crossing. I don't think the brakes were applied; I am pretty sure they were not, nor was any effort made, as far as I could tell, to stop or check the speed of the train after it was apparent that the automobile was in danger of being struck by the train. The locomotive engine was not shut off until after the collision. * * * I think the automobile was going slow enough to be able to stop in the distance after it turned to the right approaching the crossing and before it reached the railroad track."

Henry A. Smith, a passenger in the automobile, swore:

"I do not know whether or not Wiley Sloman, or any of the others in the automobile, knew of the approach of the train until too late to avoid being struck by the train. I myself did not know it. I myself did not know that it was approaching the crossing where we were struck. I knew nothing of the train or its approach until it struck us, wrecking the machine and killing all but myself. I heard neither any whistle blown or bell rung on the train as it approached the crossing where the machine was wrecked. Had the whistle been blown I think I would have heard it. * * * No signal or warning was given of the approach of a train as we approached the crossing of the track. Had we known the train was coming, I think we could have stopped the automobile in time to avoid being struck by the train, but, as before stated, I did not know. The result of the collision between the automobile and train was the wrecking of the automobile and killing of five of its six occupants; I being the only one not killed. * * *

"I do not know just how fast the machine was traveling for the mile before we came to the crossing, but I judge at about 18 miles an hour, and, upon coming to the turn in the road to cross the railroad track, we slowed down sufficiently to make the turn in the road a safe turn. To my knowledge the automobile was not racing with the train. I do not know what was the condition of the automobile. To the best of my knowledge we were not going over 18 miles an hour at any time between Lamarque and the turn in the road.

"There was no warning or signal whatever given us with respect to crossing or not crossing the railroad track. No signal of any kind was given, either by a flagman at the crossing or from the train itself. If there had been a flagman at the crossing we would have seen him, and if any whistle had been sounded by the train we would probably have heard it."  ·

Mrs. Louise Smith testified:

"I heard no whistle. I could have heard it had it been blown. I heard the crash of the collision. I did not hear the whistle or bell. I can always hear the whistle on passing engines when they are blown, and I did not hear this whistle being blown or the bell being rung. I was near enough to the train to hear or see the bell, if it had been rung continuously as the train neared the place of collision. I was in the front window of my house, and could have heard the bell had it been rung and the whistle had it been blown. * * * Said shell road and crossing are much used; there is a great deal of travel over the road. It is the main and only road in the vicinity, and the travel is very heavy, especially on Sunday. * * * There was no obstacle in the way of the engineer or fireman seeing the danger as Wiley Sloman approached the crossing."

Verbeck's observations were:

"I was about 1½ blocks from the place where the collision occurred. The whistle on the engine was not blown as the train approached near the crossing. The bell on the engine was not rung continuously. I was near enough to the train to hear or see the bell if it had been rung continuously as the train neared the place of collision. I could have heard the bell had it been ringing. My hearing is fairly good. I saw the engine as it approached the crossing. Nothing was between the train and myself. There is no reason why I should not have heard or seen the bell, if it had been ringing. * * * There was no obstacle in the way of the engineer or fireman on the train seeing the danger as Wiley Sloman approached the crossing. There was nothing between the train and the automobile. There was no danger signal by whistle or bell as the engine approached near the crossing. * * * I could see the fireman; he was leaning out of the window. He was on my side, and was looking ahead. I cannot say positively whether the engineer did or did not slacken the speed of the engine until after the collision; I don't think he did. I don't think he did slacken the speed at all from the time he passed the whistling post until after the collision."

Charles T. Sloman, brother of the deceased, testified:

"That automobile was not in good running order on the date of the collision; it had loose running rods. I can honestly say that the automobile could not make over 18 or 20 miles, or 23, miles, because it was in a condition that the connecting rods was biting the side of the crank casing, because I had taken a man that morning to the John Sealy Hospital, and I had to slow up several times to let the con-

necting rods cool off on account of the heating up.

"The automobile had two brakes, a foot brake and an emergency, and the brakes were in good order. I should judge the foot brake alone on that car could have stopped the car when going at a speed of 20 to 25 miles an hour in about 30 feet, and with the emergency brake also between 20 and 25 feet. With the car going at a speed of 18 miles an hour the car could have been stopped with the foot brake alone at about 25 or 30 feet, as I say, something like that, and with the emergency brake between 20 and 25 feet, about takes the length of the car. * * * This automobile made a noise on account of the connecting rods being loose, and it had a cut-out on it; if the cut-out was open it made more noise, if you run with it open."

W. N. Ayers testified:

"As the automobile came into the turn there, making that turn for the railroad track, its speed was slackened. * * * My location at the time relative to this crossing was about 150 yards north of the crossing on the west side of the shell road near the railroad track. I had a clear view of the crossing and what occurred at the crossing at the time of this collision; I could see. When the train passed the whistling post she continued in a direction nearer to me; she approached me. I didn't hear any bell rung on the engine. My hearing is tolerably good. There was nothing between me and the train as it approached. The train passed as close as about 70 feet to me. I can hear a bell on a train at 70 feet distance. The whistle on that engine was not blown at any other time as it approached that crossing, except at the whistling post, and not thereafter.

"I was standing on the west side, northwest of the crossing about 150 yards of the crossing, on the other side, and I was talking to Mr. Fred Verbeck. He came up there on his motorcycle, and stopped there at the right of way fence, standing there talking. I didn't notice those parties coming in this automobile from up the road until the driver hollered at me and waved his hand; as he passed me he waved his hand. * * * Sloman, to have seen that train coming when he looked out and waved at me and was passing me, would have had to look back behind him to see the train coming. If he was sitting in the machine I would be on this side, and as he come along he would have to turn his head about like that to see that train. * * * After Sloman passed me I didn't see him look back, or anything just kept going ahead on right for Galveston or somewhere else; I didn't see him look back. * * *

"When Mr. Sloman passed me he saluted with one hand; I was west of the shell road and east of the railroad track; I was between the shell road and the railroad track; it is about 70 feet from the shell road, and he was going southeast; the railroad track was further that way, and as he passed he waved at me; he was then right opposite me, and the train was up by the whistling post, back behind; back behind the automobile. In order to see the train from the position he was in when he waved at me, Mr. Sloman would have to turn about halfway around. Facing this way, going into a southeasterly direction, he would have had to turn this way, about halfway around. The top of the automobile was up.

"When the automobile made the turn to cross the track it had to go about 30 feet or 40 feet to cross the first track where the collision occurred. The remark made that there was danger of a collision was made just as he turned, just as he was in the act of turning. * * *

"I know what positions the engineer and fireman occupy, respectively, usually; they are on opposite sides. They occupy such positions that either one or the other could have seen the automobile ahead of the train as it made the turn. * * * I do not know the exact rate of speed that the automobile was going or the train was going, and I am simply giving my best judgment. * * * The engine caught up with the automobile on the crossing at the time of the collision."

It thus appears from an abundance of the evidence that the jury were authorized to and no doubt did conclude that both the engineer and fireman saw the automobile when it turned the corner; confessedly neither did anything toward using any of the several means at hand to avoid the accident until it was too late; whether either of them had a right in the circumstances presented to assume that the automobile would not attempt to cross in front of the rapidly moving train was at the least a question for the jury; they certainly, in the absence of a scintilla of evidence indicating any such intention, could not speculate on whether it would stop or turn aside before reaching the crossing, but that is precisely what they did do; the rule so clearly stated by the Chief Justice of this court in Electric Co. v. Antonini, 152 S. W. 845, directly applies:

"That the motorman saw the boy approaching the crossing in time to have slackened the speed of the car and prevented the collision is clear from the evidence. If the manner in which the boy was driving was such as to reasonably indicate that he intended to cross in front of the car, it was the motorman's duty to at once use proper care to prevent the collision. He had no right to take any chance on the boy's getting across before the car reached him, nor could he speculate on whether he would stop or turn aside before he reached the track; there being nothing in the boy's action to indicate any such intention. In such circumstances we think ordinary prudence required that the motorman should act on the reasonable appearance of danger or peril to the appellee, and not wait until the danger was manifest and the injury unavoidable."

The judgment of this court was affirmed, and a writ of error refused.

The cases supporting this doctrine might be cited at length, but it is deemed unnecessary.

We turn to the final inquiry whether, with the proper use of the means at hand, it would have at least been possible to avoid the injury, for that is the measure of the requirement in this respect. Railroad Co. v. Sloman (Tex. Civ. App.) 195 S. W. 324, par.

6. This comprehends the included issue as to whether the accident could have occurred under the stated findings of the jury. There is no controversy over what the means were, nor their availability; these being the stopping or slackening the speed of the train, the sounding of the whistle, ringing the bell, the blowing off of steam. The remark of this court on the former appeal, applied to the present facts, by substituting the distance figures this time found, may appropriately be repeated here:

"Who can say that one shrill and almost instantaneous danger signal from either bell or whistle or both at the very moment the jury found the engineer or fireman realized or discovered that Sloman was thus approaching the crossing, and when they were about 385 feet apart, would not have averted the collision? Certainly this court cannot; and, as already stated, the jury have not. If such signal could have been both given and heard by Sloman at about that fateful moment, his automobile, under the undisputed testimony here, could have been stopped within half the 40 feet then intervening between it and that railroad crossing."

On this feature of the case the vice in the majority view, as occurs to me, is in assuming, in consonance with appellant's able arguments, that the minimum speed of the automobile after turning the corner, and with only 40 more feet to go, was 10 miles per hour. There is no such evidence; hence the conclusion rests upon a mere assumption. It stands in this record undisputed that the automobile *slowed down for that corner sufficiently to make the turn a safe one,* without specification of how slow a rate of speed that brought it down to. Moreover, the jury might well have found upon sufficient evidence, which has already been quoted here, that its speed for a mile before reaching the turn had not been over 18 miles per hour. Now I apprehend that if there is any state of facts in evidence under which the findings actually returned can be reasonably sustained, they will, in deference to the verdict, be deemed to have formed its basis. In connection with this consideration, there is no serious question with me that the 385 foot distance of the engine from the crossing found by the jury had ample support in the testimony; the bystanders, Verbeck, Ayers, and John Anthony, all fixed the distance at about 450 feet, and there is no wide variance between their estimates and the ones that must follow from the testimony of both

the engineer and fireman; they each insisted that the automobile was ahead of the train, the fireman saying that it was about 3 telegraph poles, or about 330 feet, ahead just before it turned the corner at the 40-foot point, while the engineer put them 3 or 4 telegraph poles, or between 330 and 440 feet, apart during the time he saw the automobile. The jury had a right to reconcile these differences, and the resulting figure of 385 feet is neither unwarranted nor unreasonable.

That being so, the automobile could have been running after slowing down to make the crossing safely at a speed above 5 miles per hour, and yet the collision occurred, just as the jury found it did, under a rate of either 40 or 50 miles for the train, while, if the uncertain statements of the fireman and engineer are to be taken, there could have been no such occurrence. Neither of them fixed the speed of the automobile, but both said it kept ahead of them, the fireman saying he thought it was going about as fast as he was; hence, if at the time it turned the corner the train was even the minimum 330 feet of his and the engineer's estimate away and moving at either 40 or 50 miles an hour, it would have cleared the crossing before the train reached there.

Further discussion is deemed unnecessary. It seems to me that the verdict of a jury, although on special issues, should be construed as a whole, reasonably and liberally, and with a view that it should stand rather than fall. Dodd v. Gaines, 82 Tex. 429, 18 S. W. 618; Gulf, C. & S. F. Railway Co. v. Baker (Tex. Civ. App.) 218 S. W. 7; Allison v. Chandler, 11 Mich. 542, 24 L. R. A. (N. S.) 70, footnote. The rates of speed and distance here involved were, from the nature of the case, estimates only, and not susceptible of mathematical accuracy, although stated by the jury in the terms of that exact science. They should therefore be so applied and harmonized as to uphold the obvious and well-sustained purpose of the jury, and that was to find, in obedience to ample evidence before them, that the exercise of ordinary care on the part of the trainmen in this instance both could and probably would have prevented the snuffing out of so many human lives.

In the firm conviction that substantial justice has not been permitted to take its course in this cause, this protest over the refusal of this court to affirm the judgment rendered below is respectfully entered.